[Crim. No. 2966. Fourth Dist., Div. One. May 24, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. STEVEN ARTHUR CLARK et al., Defendants and Appellants.

George H. Chula and Sidney Lester for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Mark A. Ivener, Deputy Attorney General, for Plaintiff and Respondent.

WHELAN, J.—Defendants Elaine Rose Fodor (Fodor) and Steven Arthur Clark (Clark) respectively appeal from an order placing Fodor on probation following her conviction of the offense of being present in a place where to her knowledge marijuana was being used (Health & Saf. Code, § 11556), and a judgment imposing sentence on Clark for the crime of possession of marijuana (Health & Saf. Code, § 11530).

Their convictions were in a nonjury trial in which the evidence, by stipulation, including the personal stipulations of both defendants, was that in the transcript of the preliminary hearing and the stipulations made therein.

At the time the case was called for trial, but before commencement of trial, a motion on behalf of both defendants to suppress the physical evidence was heard and denied. That motion was decided upon the transcript of the oral proceedings at the preliminary hearing and upon the testimony of witnesses including that of two of the police officers who had testified at the preliminary hearing, Keenum and Doum. In that hearing, the other witnesses on behalf of the prosecution were Bruce Sandie and John P. Barry. On behalf of defendants, witnesses testified as to whether Clark wore a beard on the day of his arrest; and as to the conduct of the police officers with relation to a person other than defendants who neither was present at the time of the arrest of defendants nor was claimed by the prosecution to be in any way connected with defendants except as a neighbor.

Prior to the setting of the case for trial, defendants had made a motion under section 995, Penal Code, which was denied.

### CONTENTIONS ON APPEAL

Defendants' contentions on appeal may be epitomized as follows:

The arresting officers, acting without a warrant, had no right to force an entry into the premises where marijuana was found and seized; and all evidence observed and seized following such illegal entry was illegally seized whether or not it was the result of a search.

The summary that follows is a composite of testimony upon which the motion to suppress was decided, given both at the hearing of that motion and at the preliminary hearing. No

question as to the sufficiency of the evidence is involved if the evidence sought to be suppressed was properly admitted.

## THE LAWFULNESS OF THE ENTRY

Shortly before 11:55 p.m. on January 5, 1967, Bruce Sandie (Sandie), a deputy probation officer, resident at 121 39th Street, Newport Beach, was awakened from his sleep by screams from outside his house. Upon awakening he heard a woman scream several times, ''Help me''; the screams seemed to come from the street directly in front of his house. Thinking that there was an emergency calling urgently for action, Sandie went out of the house, looked around, observed some of his neighbors on the balconies of their houses who he thought had come out because of the noise, went to the side of his property nearest the beach and did not see any woman; he then went to the alley behind the house and saw no one; he returned to the front and heard a woman sobbing from the direction of the beach; he went into the house and had his wife call the police.

John P. Barry (Barry), resident of 122 39th Street on the opposite side of the street from Sandie, was returning home after walking his dog and heard voices of a man and woman raised in argument from a Volkswagen parked across the street; after entering his house, and while reading, he heard what he thought were the same voices, now louder; he did not hear much screaming; from time to time as the voices became louder, he went out onto the balcony, on the last occasion heard a man's voice say, ''Get the hell out''; he shortly saw a woman get out of the Volkswagen followed by a man who went around to the woman at the other side of the car; she appeared very disturbed, was crying and started to walk away; the man caught up with her and took hold of her around the waist; together they entered the gateway of a wall surrounding a house adjacent to and on the ocean side of Sandie's residence. By that time Barry had come down onto the street. He had been considering whether he should call the police. He demonstrated the manner in which the man held the woman as they walked.

Between 5 and 15 minutes after Sandie had been awakened by the screams, Keenum and Doum arrived; they had received a radio call to investigate a report of a woman's screaming for help; they found Sandie in the street; Sandie told them his wife had placed the call and what he had heard. While Sandie talked to the officers, Barry, in pajamas, came up and told the police what he had heard and seen. From Barry's

statement, Keenum received the impression that Barry had heard the woman in the Volkswagen call for help.

The two police officers went into the area surrounded by the wall, into which they had been told the man and woman had gone, and in which was a two-story residential building. They knocked at a door at the street level; a woman came to the door who, after Keenum had identified himself and asked if she had called for help, said she had not, and when asked if there was anyone in the apartment above, said there were people living there but she didn't believe they were at home.

Keenum and his partner then went to the door of the upper apartment, approached by a short flight of steps, where Keenum knocked. Clark opened the door a few inches to the length of a security chain. Keenum, in uniform, identified himself, shined a flashlight on his badge, face and uniform, and asked if there was anybody that needed help, saying that he had had a call for assistance in the area. Clark said, "Wait a minute" and shut the door. Keenum heard Clark walk up the stairs; heard glass breaking and people shuffling around in the upstairs apartment. Keenum sent Doum around to the rear, while he again rapped on the door, identified himself as a police officer and said, "Let me in"; Doum meanwhile, at the exterior rear, saw Clark open a window and thrust his head and shoulders out the open window above a garage roof 3½ feet below, which in turn adjoined a three-foot high block wall, the top of which was some three feet below the garage roof at its lowest point.

Doum directed the light from his flashlight toward Clark and shouted, "Police officer. Get back inside the building," at which Clark immediately withdrew from the window. Doum shouted to Keenum, "They're trying to split out the window" and himself went back to the entrance, where Keenum, after hearing that someone had been trying to get out a rear window, shouted, "This is a police officer. Open the door; I will kick it in." No one came to the door; Keenum kicked it in and entered, followed by Doum.

The door opened at the foot of a flight of stairs to the right. Keenum went up the stairs which brought him into the living room and an adjacent unseparated area where there was a table about 10 feet from the head of the stairs. Two men were sitting in the living room; on the table was a transparent glass bottle widening from its neck down to its base, in which Keenum saw the butts of about 10 cigarettes ½″ to ¾″ long that he thought, from training and experience, to be

marijuana; almost as he made that observation Fodor walked out from what Keenum discovered later was a bedroom and Keenum heard the flushing of a water toilet, a sound that was being repeated continuously more than five or six times. He and Doum went to the door of the bathroom, which was locked; he again identified himself as a police officer and asked that the door be opened; a man within said, "No, I won't open the door." Both of the police said they were police officers and that if the door should not be opened they would kick it in. After that the door was opened and Clark came out; inside on the floor were plastic bags containing a green leafy substance; others were in the bowl with green leafy material that appeared to be marijuana floating in the water. There was a package of marijuana 10"x15" in size inside the toilet tank; another package of marijuana of the same size was in the bedroom, the entrance to which from the living room was alongside the bathroom door.

Before receiving the radio call that a woman was in need of help, neither Keenum nor Doum had been to the apartment before; they had no information or suspicion that there might be marijuana there before Keenum saw the bottle with the cigarette butts; and they did not know the defendants. Keenum's purpose in going to the apartment was to find and assist the woman who had called for help and who he thought, when he demanded and forced admittance, was within.

## WAS THE FORCED ENTRY LEGAL?

It is obvious that the steps taken by the police after Keenum saw the contents of the bottle and made his tentative identification as marijuana were reasonable and almost inevitable given that identification. The repeated flushing of the toilet behind the locked door of the bathroom in premises where marijuana is being kept and the police are at the threshold is almost a commonplace signal of the destruction of contraband.

It is the reasonableness and legality of the steps that brought Keenum through the outer door and up to the head of the inner stairs that require examination.

The reasonableness of the conduct of the police in demanding and forcing entry must be measured against the information they had received from Sandie and Barry and what they themselves had seen and heard.

Having been summoned just before midnight by a citizen to a neighborhood where residents on both sides of the street and

for some distance along its length had been disturbed by noisy argument, sobbing and cries of a woman for help; having received that information and the additional information that the woman probably involved had been seen going to a house in which there were two apartments, conducted and possibly propelled by a man; having learned that no call for help had been given by a woman who was in one of the two apartments, the officers reasonably and properly went to the door of the other apartment. They would have been in neglect of their duty if they had not done so.

At that door a man answered who, after Keenum had made his inquiry, made a remark calculated to lead Keenum to believe that the man would return to the door; in all of that there had not been any unlawful assertion of authority; the man did not return; instead, after an interval during which Keenum was requesting admittance, he heard the sounds of running and shuffling feet and of breaking glass; he was informed by Doum that someone was trying to get out a rear window of the two-story building; he again identified himself, demanded admittance with the alternative of breaking open the door.

We are of opinion that the trial court properly concluded that the combination of those circumstances presented to the police a situation of emergency to meet which they reasonably forced their entrance into the apartment. The probability that a woman within the apartment was the unwilling victim of some criminal act was increased rather than lessened by the conduct of those within the apartment after the police presented themselves at the door; that conduct can only have had the effect of heightening the sense of emergency.

As a necessary part of the holding in *People* v. *Roberts*, 47 Cal.2d 374, 377-378 [303 P.2d 721], the court declared: "The trial court found that the officers reasonably believed that someone inside the apartment was in distress and in need of assistance and that they entered for the purpose of giving aid. Necessity often justifies an action which would otherwise constitute a trespass, as where the act is prompted by the motive of preserving life or property and reasonably appears to the actor to be necessary for that purpose. (*Ploof* v. *Putnam*, 81 Vt. 471 [71 A. 188, 189, 130 Am.St.Rep. 1072, 15 Ann.Cas. 1151, 20 L.R.A. N.S. 152]; *Metallic Compression Casting Co.* v. *Fitchburg R. Co.*, 109 Mass. 277, 280-281 [12 Am.Rep. 689]; see Rest., Torts, § 197; Prosser on Torts [2d ed.], 84, 97.)"

Having entered reasonably in an emergency "they did not have to blind themselves to what was in plain sight simply because it was disconnected with the purpose for which they entered." (*People* v. *Roberts, supra,* 47 Cal.2d 374, 379.)

*People* v. *Shelton,* 60 Cal.2d 740 [36 Cal.Rptr. 433, 388 P.2d 665], upon which defendants rely, was a different kind of case in which police, unarmed with a search warrant, went to an apartment for the express purpose of searching it for heroin and demanded entry under an assertion of authority and under the guise of seeking an interview with the occupant.

The other cases cited by defendants are as little apposite as *Shelton*: *People* v. *Henry,* 65 Cal.2d 842, 845 [56 Cal.Rptr. 485, 423 P.2d 557]; *People* v. *Michelson,* 59 Cal.2d 448 [30 Cal.Rptr. 18, 380 P.2d 658]; *People* v. *Harvey,* 156 Cal.App. 2d 516 [319 P.2d 689]; *People* v. *Brown,* 45 Cal.2d 640 [290 P.2d 528]; *Gascon* v. *Superior Court,* 169 Cal.App.2d 356 [337 P.2d 201]; *United States* v. *Rabinowitz,* 339 U.S. 56, 60 [94 L.Ed. 653, 657, 70 S.Ct. 430, 432]; *People* v. *Gastelo,* 67 Cal.2d 586 [63 Cal.Rptr. 10, 432 P.2d 706]; and *People* v. *Reeves,* 61 Cal.2d 268, 275 [38 Cal.Rptr. 1, 391 P.2d 393].

The judgment is affirmed.

Brown (Gerald), P. J., and Coughlin, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied July 17, 1968.