[L.A. No. 29767. In Bank. Dec. 28, 1970.]

DAVID MICHAEL HORACK, Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

## COUNSEL

Herbert M. Porter for Petitioner.

Cecil Hicks, District Attorney, Michael R. Capizzi and Oretta D. Sears, Deputy District Attorneys, for Respondent and for Real Party in Interest.

## OPINION

MOSK, J.—This is a petition for a writ of mandate after the respondent superior court denied petitioner's pretrial motion pursuant to Penal Code section 1538.5 to suppress evidence seized in a search of a residence. Petitioner is charged with the unlawful possession of marijuana.

On Saturday, June 28, 1969, Officer Thompson of the Newport Beach Police Department, while on patrol duty in a police vehicle, received a radio message from the dispatcher informing him that a Mrs. Hamplin of 521 Riverside, Newport Beach, had telephoned to report that she had seen two "hippie-type" individuals with sleeping bags enter what she believed to be the vacant residence located next door at 519 Riverside. Officer Thompson proceeded to Mrs. Hamplin's address, but his knock on the door there brought no response. It was later established that she had driven away from her home as Officer Thompson approached.

Having been unable to contact the informant, or to ascertain that she was reliable and had in fact telephoned the police station, Officer Thompson next walked to the residence at 519 Riverside and, stationing another officer at the rear, went to the front door, knocked on the door and identified himself by announcing "Police Officer." Standing in front of the door, he could see into the living room of the house through a window in the door: the room was carpeted, but otherwise contained no furnishings with the exception of a large stereo speaker enclosure and stereo receiver. The receiver was turned on and he heard music playing "quite loud." There was no response to the knock or announcement and he heard no sounds from inside except the music. He tried the front door and found it locked.

Officer Thompson proceeded to the rear of the house at which time he was joined by Sergeant Petersen. The other officer who had been stationed at the back door then left. The two remaining officers approached the back door and knocked. Again, no sound was heard from the inside. They tried the door and found it unlocked. Officer Thompson opened the door and, before entering, again announced "Police Officer." He did not explain the purpose for which admittance was desired. Still receiving no response, both officers entered the house with their guns drawn. The entry was made at approximately 1 p.m. The officers proceeded to conduct a room-by-room and closet-by-closet search for the persons who reportedly had entered the house.

Officer Thompson testified that the reason he sought entry was to "ascertain if there were people in the dwelling that did not have the authority to be inside." Although he had heard no response to his knocking on the door or his announcements, he entered "Looking for individuals hiding; figured that they probably heard me and were hiding if they were in there." He also stated that he thought "there might be possibly a burglary being committed inside the residence," although he candidly conceded on *voir dire* that he saw absolutely nothing to indicate that a burglary was in progress. He further admitted that he had never heard of a vagrant going into a house to sleep with his own expensive stereo equipment, the value of

which he estimated to be approximately $300, nor had he ever heard of any persons leaving valuable stereo equipment behind when they moved out of a house. Finally, the officer indicated that the appellation "hippie-type" had no special significance to him and that he did not know what Mrs. Hamplin meant when she used it.

The rear door of the house opened into a rear bedroom and, finding no one in the room, Officer Thompson checked the closet. The closet was also empty, and Thompson proceeded to another rear bedroom in search of the intruders. Finding no one, he then looked into the closet of that room. Although this closet, too, was devoid of human occupation, Officer Thompson made an important discovery: on the shelf of the closet, at eye level, he saw a little plastic "Baggie" containing marijuana. He also observed some clothing hanging in the closet. Taking the contraband with him, Officer Thompson next searched a linen closet that was two and one-half to three feet wide and ran from the floor to the ceiling. It had two sets of double doors, and Officer Thompson was of the opinion that the bottom portion of the closet was big enough for a person to get into if he were crouched down; therefore, he opened the doors to the bottom portion. On the bottom shelf, just above the floor, he saw a cardboard box which contained a smaller shoe box. The shoe box was on top of a stack of papers and, because it was positioned at an angle, he could see its contents. In the shoe box he saw another "Baggie" which was found to contain more marijuana and a bricklike piece of hashish.

Officer Thompson took the cardboard box into one of the rear bedrooms he had already searched and placed it on the floor. At this time, he saw some papers scattered on the floor, including a "bill of sale for the house and offer for sale" which had petitioner's name on it. He left the bill of sale on the floor and, with Sergeant Petersen, checked the bathroom and a third bedroom and its closet, still seeking the elusive intruders. Having satisfied himself that no one was in the house, Officer Thompson then telephoned the station and requested that Officer Epstein of narcotics detail come to the house.

Upon his arrival, Officer Epstein examined the contraband already discovered, confirmed Thompson's identification of the substances found, and proceeded to a thorough search of everything in the house not previously searched by Officer Thompson. In clothing hanging in the closet of one of the rear bedrooms, Epstein found a small "Baggie" of hashish and a passport, an international driver's permit, international vaccination certificate, and Hertz car rental document, all bearing petitioner's name. In the third bedroom, on the floor, he found a leather pouch containing a pipe and a small piece of hashish. He also found various documents containing the name of Michael Turkington and, apparently, $12,000 in cash. The

cash was turned over to the State Board of Equalization and is not in issue on this petition. In the bedroom farthest to the rear, Officer Epstein found documents in the name of M. R. McCurdy on the floor and a small piece of hashish in a pair of boots.

At no time during the various searches or during a brief surveillance period which followed did any one of the suspects appear; nor did the police find any sleeping bags in the house. Petitioner was subsequently arrested in Laguna Beach, but the details of his arrest are not part of the record presently before us.

The sole issue is whether the police entry and subsequent searches, which turned up the marijuana and hashish sought to be suppressed, were in violation of the Fourth Amendment protection against unreasonable searches and seizures. ■ Petitioner made out a prima facie case that the search and seizure were unlawful when he established that they were made without a warrant; the burden then rested on the prosecution to show proper justification. (*People* v. *Haven* (1963) 59 Cal.2d 713, 717 [31 Cal.Rptr. 47, 381 P.2d 927].)

■ With respect to the search conducted by Officer Thompson and the evidence he discovered, the People contend that the entry and search for persons believed to be in hiding were authorized by the general duty of the police to investigate, detect, and prevent crime and to protect life and property. Under the circumstances of this case we cannot agree.

The doctrine of necessity relied on by the People is applied in cases such as *People* v. *Roberts* (1956) 47 Cal.2d 374 [303 P.2d 721], *People* v. *Clark* (1968) 262 Cal.App.2d 471 [68 Cal.Rptr. 713], and *People* v. *Gonzales* (1960) 182 Cal.App.2d 276 [5 Cal.Rptr. 920], involving emergency circumstances which are simply not present in the facts of the instant case. Thus, in *People* v. *Roberts*, we stated that "[n]ecessity often justifies an action which would otherwise constitute a trespass, as where the act is prompted by the motive of preserving life or property and reasonably appears to the actor to be necessary for that purpose." (47 Cal.2d at p. 377.) The "necessity" in *Roberts* was that police heard a moaning sound as if from a person in distress and entered defendant's apartment to render aid; the evidence sought to be suppressed was discovered in plain sight after the valid emergency entry. Similarly, in *Clark*, police entered the defendant's apartment because circumstances apparent to the officers indicated the "probability that a woman within the apartment was the unwilling victim of some criminal act." (262 Cal.App.2d 471, 476.) And in *Gonzales*, a police officer discovered marijuana in a search for identification in the clothing of a man found seriously injured with an abdominal stabbing wound.

In the case at bench, there was no comparable emergency situation. The only property to be protected was the bare carpeted house containing a stereo system, and the police officers saw nothing to indicate any immediate threat of damage or destruction. Indeed, Officer Thompson candidly admitted that he saw nothing to indicate that a burglary was in progress or had been committed. And even the most vivid imagination would be unable to contrive imminent danger to human life in the situation apparent to Officer Thompson and Sergeant Petersen prior to their entry. Therefore, no justification for the entry and search may be found in the doctrine of necessity.

An alternative justification for the entry and search might be sought in Penal Code sections 836, subdivision 1, and 844. Section 836, subdivision 1, authorizes a police officer to make an arrest without a warrant "[w]henever he has reasonable cause to believe that the person to be arrested has committed a public offense in his presence." ▮ Section 844 justifies an entry by police officers into a closed residence in order to make an arrest, if they have reasonable grounds for believing the person to be arrested is inside and if they have demanded admittance and explained the purpose for which admittance is sought. ▮ Thus, it might be argued that the entry and search were justified to arrest persons whom the officers had probable cause to believe were committing, in their presence, the offense of unlawful occupancy of a dwelling.[1] Such concept ostensibly would be consistent with Officer Thompson's testimony as to his purpose in entering the residence: to "ascertain if there were people in the dwelling that did not have the authority to be inside."

The foregoing theory necessitates a showing that Officer Thompson and Sergeant Petersen had reasonable cause to believe that there were within the dwelling persons who had entered without authority. ▮ We conclude, however, that the facts and circumstances perceived by the officers prior to their entry could not provide them with the requisite reasonable cause.

Regardless of the status of any persons inside the dwelling, the officers initially must have had reasonable cause to believe that there were, in fact, persons inside at the time of their entry. Officer Thompson knew that, some time before his arrival on the scene, Mrs. Hamplin had reported seeing two persons enter the residence at 519 Riverside. Mrs. Hamplin's reliability as an informant had not been established, and, indeed, the officers could not ascertain with certainty that it was she who called. Never-

---

[1]Penal Code section 602.5 makes it a misdemeanor for any person to enter or remain in any noncommercial dwelling house or apartment without the consent of the owner.

theless, assuming arguendo that her reliability had been established so that the officers could be certain that persons had entered the house (see *People* v. *Hogan* (1969) 71 Cal.2d 888, 890-891 [80 Cal.Rptr. 28, 457 P.2d 868]; *People* v. *Guidry* (1968) 262 Cal.App.2d 495, 497-498 [68 Cal.Rptr. 794]), the officers had no way of knowing whether the persons had left the residence prior to their arrival. Indeed, Mrs. Hamplin herself had left the scene between the time of her call and the arrival of the police.

When Officer Thompson approached the house and looked inside, he could see no one, and complete silence greeted his knocking and announcements at both the front and rear doors. The only indications that there might be someone inside the residence were that the radio was turned on and the back door, though closed, was unlocked. However, neither of these circumstances justifies a reasonable inference that persons are present; when an occupant leaves a house temporarily, it is not unusual for him to fail to turn off a radio, but it would be most unusual for an unauthorized intruder to call attention to his presence with a musical accompaniment. Indeed, many law enforcement agencies publicly suggest leaving lights and radio on when homeowners are absent, as a deterrent to potential burglars.

But even assuming further that there was reasonable cause to believe persons were in the house, the officers still had no basis for entry to search for the persons, unless they had reasonable cause to believe that the persons were committing a public offense in their presence—in this case, that could only be occupancy of a dwelling without authority. Only the wandering fancy of the police officer, and not a reasonable interpretation of the circumstances here, could explain such belief.

The only evidence to indicate that persons who might be inside the residence must be occupying it without authority came from Mrs. Hamplin's purported report relayed secondhand to Officer Thompson from the station dispatcher. We can assume Mrs. Hamplin believed the "hippie-type" intruders were strangers and the house was vacant. But her view was not corroborated by any officer's observations on the scene. Officer Thompson was unable to talk with Mrs. Hamplin to determine the basis for her opinion, if any, but despite lack of further information, he approached the residence and looked inside. He saw a carpeted living room with no furnishings except an expensive stereo receiver and speaker. On *voir dire,* he candidly admitted that he had never heard of anyone moving out of a house and leaving valuable stereo equipment behind; nor had he ever heard of a vagrant entering a vacant house to sleep and carrying his own stereo. Therefore, if Officer Thompson reasonably assessed the appearance of the front room, he would have concluded that the house was probably not

vacant—that either a new owner was in the process of moving in or an existing owner was in residence but had temporarily moved the furniture from the only room visible to exterior inspection.

According Officer Thompson the benefit of every doubt, after having looked into the front room, he could have maintained, at most, a transitory suspicion that unauthorized persons might be inside. Nevertheless, as he testified, he made no attempt to ascertain the actual ownership of the residence, nor to ascertain whether the utilities or telephone had been turned on. He apparently relied exclusively on the unverified belief purporting to be that of Mrs. Hamplin that the house was vacant, even though the presence of an operating stereo system could not easily be reconciled with that theory.

After looking inside, Officer Thompson proceeded to knock at both the front and rear doors and to identify himself as a police officer. He heard no response, in fact no sound of any kind except the music from the radio. Incredibly, this silence reinforced his belief that there were persons inside without authority: because there was no response, he believed the persons were intentionally failing to open the door; because they were consciously refusing to open the door, he believed they had something to hide, namely, that they were occupying the house without authority. Therefore, Officer Thompson concluded he should enter the residence and search every room and closet in which someone might be hiding.

In our view, the silence which greeted Officer Thompson's knocks on the door and announcements of identity added nothing to his unsupported suspicion that persons were inside the residence without authority. A more reasonable conclusion would have been that no one was inside the house. But if the officer believed persons were inside, he had no basis for assuming that they heard his knocking and announcements and were deliberately refusing to respond, particularly because of the high volume of the radio.

Furthermore, even if the officer could reasonably believe and did actually believe that any persons inside would have heard him, their silence was not indication of their guilt of any offense. As we stated in *Tompkins* v. *Superior Court* (1963) 59 Cal.2d 65, 68 [27 Cal.Rptr. 889, 378 P.2d 113], "[t]here are many reasons other than guilt of a felony why an occupant of an apartment may not wish himself or others present exposed to the immediate view of a stranger, even if the stranger is a police officer. If refusal of permission to enter could convert mere suspicion of crime into probable cause to arrest the occupant and search his home, such suspicion alone would become the test of the right to enter, and the right to be free from unreasonable police intrusions would be vitiated by its mere assertion." ■ Furthermore, the "right to seek interviews with suspects or

witnesses at their homes does not include the right to walk in uninvited merely because there is no response to a knock or a ring." (*People* v. *Haven* (1963) *supra,* 59 Cal.2d 713, 717; see also *People* v. *Shelton* (1964) 60 Cal.2d 740, 746-747 [36 Cal.Rptr. 433, 388 P.2d 665].)

Therefore, if Officer Thompson lacked probable cause to arrest the occupants at the time he knocked on the doors and announced his presence, he lacked probable cause at the time he entered the house as well because the silence of the occupants provided no evidence of guilt. It is noteworthy that in both *Tompkins* and *Haven,* the officers had reason to be certain that the persons failing to respond were inside the dwellings, and yet we held that the officers were not justified in presuming guilt. In the instant case, Officer Thompson could not ascertain that there was anyone inside, but he nevertheless permitted the silence to convince him the mythical intruders were hiding.

For the foregoing reasons, we conclude that the entry and search conducted by Officer Thompson and Sergeant Petersen constituted an unreasonable search and seizure in violation of the Fourth Amendment. The officers lacked a justifiable basis for entering the residence without a warrant, and their subsequent search of the rooms and closets and seizure of marijuana and hashish violated the petitioner's constitutional right to be free from unreasonable intrusions into his private domain. Therefore, the petitioner was entitled to suppress the seized contraband pursuant to his motion under section 1538.5. No authority exists permitting the police to enter into private premises without probable cause in a search for nonexistent trespassers, and the fruits of such improper conduct cannot be received in evidence.[2]

Finally we come to the search of the premises by Officer Epstein, after he responded to Officer Thompson's call. Officer Epstein was called in because he was assigned to the narcotics detail, and his thorough search was obviously aimed at uncovering further narcotics. There was no conceivable legal basis for his warrantless search and at oral argument counsel for the People conceded his conduct was unlawful. Indeed, even if the initial invasion were sustained as a search for persons believed to be violating Penal Code section 602.5, the subsequent search for contraband would nevertheless have been unconstitutional. By the time Thompson called Epstein, it was obvious there were no persons hiding in the house. Officer Epstein's general search for evidence far exceeded the scope

---

[2]Our disposition of the instant action makes it unnecessary for us to consider petitioner's additional allegation that the search by Officer Thompson was illegal because he failed to explain the purpose for which he desired admittance, as required by Penal Code section 844.

of any activity that would have been permitted even if Thompson's entry had been legal.

Let a writ of mandate issue directing the superior court in case No. C-21818 to suppress all the evidence seized in the unlawful searches conducted by Officers Thompson and Epstein.

Peters, J., Tobriner, J., and Sullivan, J., concurred.

**BURKE, J.,** Concurring and Dissenting.—The majority hold inter alia that the entry and subsequent search by Police Officers Thompson and Petersen were unlawful and that the evidence they obtained must therefore be suppressed. The legality of that entry and search was upheld, and in my opinion properly so, by the municipal court, the superior court, and the Court of Appeal. The unfortunate effect of the majority decision will be not only to suppress evidence lawfully obtained by the two officers, but also to deprive home owners of adequate police protection when a neighbor reports having seen trespassers enter an adjacent vacant house.

The superior court, in upholding the legality of the entry and ensuing search by Thompson and Petersen, appears to have applied the doctrine of necessity. The majority recognizes that *People* v. *Roberts,* 47 Cal.2d 374, 377 [303 P.2d 721], declared, "Necessity often justifies an action which would otherwise constitute a trespass, as where the act is prompted by the motive of preserving life or property and reasonably appears to the actor to be necessary for that purpose. (*Ploof* v. *Putnam,* 81 Vt. 471 [71 A. 188, 189 . . .]; *Metallic Compression Casting Co.* v. *Fitchburg R. Co.,* 109 Mass. 277, 280-281 . . .; see Rest., Torts, § 197; Prosser on Torts [2d ed.], 84, 97.)" But, state the majority, the doctrine of necessity is inapplicable here because no emergency situation confronted the two officers comparable to that presented in *Roberts* and other cases applying that doctrine. The majority note that "The 'necessity' in *Roberts* was that police heard a moaning sound as if from a person in distress and entered defendant's apartment to render aid . . . . Similarly, in [*People* v. *Clark,* 262 Cal.App.2d 471 (68 Cal.Rptr. 713)], police entered the defendant's apartment because circumstances apparent to the officers indicated the 'probability that a woman within the apartment was the unwilling victim of some criminal act.' "

Manifestly the facts in the instant case differ from those in *Roberts* and *Clark,* but, as we shall see, the situation confronting the officers also presented an emergency situation as the superior court expressly found, and the doctrine of necessity applies.

The superior court stated that Thompson had "a responsibility as a

member of law enforcement to take reasonable steps to protect the property of the citizen," and the superior court specifically found that Thompson's purpose in entering was "to ascertain whether anyone was in there, whether we had a trespasser situation, whether somebody had come back for the weekend." The evidence supported that finding. Thompson testified that the reason he sought entry was to "ascertain if there were people in the dwelling that did not have the authority to be inside." Implicit in the court's finding and Thompson's testimony is that his entrance was prompted by the motive of preserving the property. There is no basis for assuming Petersen's motive differed from that of Thompson.

It is also implicit in the superior court's ruling upholding the legality of the search that it was reasonable for the officers to believe that the entrance was necessary to protect the property. There is sufficient evidence to support that finding.

The evidence showed that Thompson received a radio message from the dispatcher informing him that Mrs. Hamplin, whose address was 521 Riverside Drive, Newport Beach, had called and reported having seen two "hippie type gentlemen" with sleeping bags enter the residence at 519 Riverside Drive and that this residence was known to her to be vacant. From the fact that she called the police it may be inferred that she thought the individuals were trespassers, and, since she was the next-door neighbor, it is reasonable to believe that she would know the rightful occupants. It does not appear that Thompson was expressly told when Mrs. Hamplin observed the individuals or made the call but apparently both occurred shortly before the information was relayed to him.

Mrs. Hamplin was a citizen who reported having observed criminal activity. In cases involving probable cause for an arrest reliance upon the report of such a citizen or the victim of a crime has been held reasonable even though the person's reliability has not previously been established. (*People* v. *Hogan*, 71 Cal.2d 888, 890-891 [80 Cal.Rptr. 28, 457 P.2d 868]; *People* v. *Guidry*, 262 Cal.App.2d 495, 497-498 [68 Cal.Rptr. 794]; *People* v. *Gardner*, 252 Cal.App.2d 320, 324-325 [60 Cal.Rptr. 321]; *People* v. *Lewis*, 240 Cal.App.2d 546, 549-551 [49 Cal.Rptr. 579].) Similarly here it was reasonable for the police to rely upon Mrs. Hamplin's report. The fact that her report was transmitted to Thompson through official channels did not cause it to lose its reliability. (Cf. *People* v. *Hogan, supra; People* v. *Gardner, supra.*) And her report was corroborated in part by observations of Thompson at 519 Riverside Drive following his unsuccessful attempt to contact her. Through a window in the front door at that address he saw that the living room contained no furnishings except a carpet and stereo system, a matter indicating that the home was indeed

vacant.[1] The stereo was turned on "quite loud" and the back door was unlocked, circumstances tending to show that the house was or recently had been occupied by someone. Under the circumstances when the officers received no response to Thompson's knocks and announcements identifying himself as a police officer it was reasonable for them to believe that entrance was necessary to protect the property from possible harm by trespassers.

And the situation confronting them was an emergency, as the superior court found. In this era, with vandalism, burglary, and trespass all too common, the owner could well have complained had the officers merely walked away from the house without taking any further action upon receiving no response to Thompson's knocks and announcements identifying himself.

The majority, in concluding that no emergency was presented comparable to that in *People* v. *Roberts, supra,* 47 Cal.2d 374 and *People* v. *Clark, supra,* 262 Cal.App.2d 471, reason, "The only property to be protected was the bare carpeted house containing a stereo system, and the police officers saw nothing to indicate any immediate threat of damage or destruction." Before entering, the officers, of course, did not know what might be stored in the areas not then visible to their view, but even if "[t]he only property to be protected" was that mentioned by the majority, such property manifestly was worth thousands of dollars. And I am certain it would be a novel idea to most home owners that when a neighbor has seen trespassers enter an adjacent vacant house no emergency exists unless in addition the police observe something indicating an "immediate threat of damage or destruction." Extensive vandalism to nearly any house, of course, can occur in areas not visible from the outside.

There is no merit to petitioner's claim that failure by Thompson and Petersen to comply with the demand and explanation requirements of Penal Code section 844 rendered their ensuing search unlawful. Section 844 provides: "*To make an arrest . . .* a police officer, may break open

---

[1]The superior court took judicial notice that Newport Beach is a resort area in which owners are often absent for substantial periods, and that sometimes owners, upon leaving their resort homes, take some of their furniture and leave some behind, and the superior court stated "I am not particularly surprised at the fact there was a house with a stereo in it . . . the house was to all intents and purposes vacant with the exception of the stereo."

The majority draws an inference contrary to that reasonably drawn by the superior court as to whether the house was vacant. It is, however, elementary that an appellate court must accept all reasonable inferences *supportive* of a ruling by a trial court. (*People* v. *Reilly,* 3 Cal.3d 421, 425, fn. 1 [90 Cal.Rptr. 417, 475 P.2d 649]; *People* v. *Anthony,* 7 Cal.App.3d 751, 762 [86 Cal.Rptr. 767]; *People* v. *Fisher,* 184 Cal.App. 2d 308, 312 [7 Cal.Rptr. 461].)

the door . . . of the house in which the person to be arrested is, or in which they have reasonable grounds for believing him to be, after having demanded admittance and explained the purpose for which admittance is desired." (Italics added.) Here, since the purpose of the officers in entering was not "[t]o make an arrest" but to protect the property, the section is inapplicable. The privilege to enter property arising out of necessity must be exercised in a reasonable manner. (See Rest., Torts, § 197.) The method of entry in the instant case manifestly was reasonable. Thompson knocked on the front and back doors and identified himself as a police officer but received no response. He and his fellow officer subsequently entered through an unlocked door.

The officers could properly make only that kind of search reasonably necessary to determine whether trespassers actually were in the house. (Cf. *Terry* v. *State of Ohio*, 392 U.S. 1, 29 [20 L.Ed.2d 889, 910, 88 S.Ct. 1868]; *People* v. *Roberts, supra,* 47 Cal.2d 374.) Here it is apparent from the facts recited by the majority that the search by Thompson and Petersen did not exceed that scope. In conducting such a search, they were not required to blind themselves to what was in plain sight simply because it was disconnected with the purpose for which they entered. (*People* v. *Marshall*, 69 Cal.2d 51, 56 [69 Cal.Rptr. 585, 442 P.2d 665]; *People* v. *Roberts, supra,* 47 Cal.2d 374, 379.)

The majority's conclusion regarding the entry and search by Thompson and Petersen is contrary to both the law and common sense, and with respect to that portion of the decision I dissent.

With respect to the search later made by Officer Epstein of narcotics detail, I agree with the majority that his search was unlawful, as was conceded by the People at oral argument. I therefore concur with the majority opinion insofar as it directs the superior court to suppress the evidence seized in Epstein's search.

Wright, C. J., and McComb, J., concurred.