105 Cal.Rptr.2d 314 (2001)
87 Cal.App.4th 1265
The PEOPLE, Plaintiff and Appellant,
v.
Christopher Michael WEISE et al. Defendants and Respondents.
No. D034948.
Court of Appeal, Fourth District, Division One.
March 23, 2001.
As Modified on Denial of Rehearing April 20, 2001.
Review Denied July 11, 2001.[*]
*315 Paul J. Pfingst, District Attorney, Thomas F. McArdle and James E. Atkins, Deputy District Attorneys, for Plaintiff and Appellant.
David B. Songco, San Diego, for Defendants and Respondents.
BENKE, Acting P.J.
The People appeal denial of a motion to reinstate a criminal complaint under Penal Code [1] section 871.5. (§ 1238, subd. (a)(9).) The People contend the magistrate erred in suppressing evidence obtained when police officers entered a residence to check on the welfare of occupants. We find the seizure of evidence was proper and therefore the superior court's refusal to grant the People's motion under section 871.5 was erroneous.

BACKGROUND
On June 11, 1999, at approximately 9:45 p.m., San Diego Police Officer Thomas Broxtermann received a radio call to proceed to a residence in Pacific Beach. The residence was a single-story unit, which was part of a complex consisting of two duplexes separated by a walkway. A neighbor at the residence, Ms. Sweetman, reported loud music had been coming from the unit and she and other people at the complex were upset and worried. Broxtermann and a second officer, Jason McAnnally, responded.
On arriving, Broxtermann could hear the music from outside the complex. Ms. Sweetman informed Broxtermann she knew the two men who lived in the apartment as "Chris" and "Johnny" (later identified as defendants Christopher Michael Weise and Giovanni Verdone in this action). She did not know their last names but indicated they were quiet and in their late 20's. To her knowledge the loud music had been coming from their unit for about 24 hours. During this period, she had not seen the men but thought one was out of town. She indicated further that it was very unusual for loud music to be coming from the unit.
After Broxtermann noticed what appeared to be a couple of days of mail and newspapers stacked at the doorstep, he pounded very hard on the door. Receiving no response, he and McAnnally tried to *316 look inside the residence. The blinds, however, were all closed. They then tried the doors and windows and found they were not open. Broxtermann was able to look inside a small bathroom window but it was pitch black inside. He could, however, see a light coming from a back bedroom. He could also see there was a light on in a stereo unit.
After examining the entrances to the residence, Broxtermann tried to find the telephone number to the unit by calling the police department's communication division. There was no telephone number listed.
Broxtermann contacted Ms. Sweetman's roommate Ms. Driscoll. Ms. Driscoll told Broxtermann the loud music had been playing since the previous evening and it was abnormal. She had not seen Chris or Johnny in the last 24 hours and thought there might be someone injured inside. Broxtermann then tried to contact other neighbors to determine if anyone had seen the men. His attempts were unsuccessful. He also tried to determine if the residents' cars were in the garage, but it was locked. He located the circuit breaker for the complex but was not able to turn the electricity off to the unit.
Broxtermann had 15 years' experience as a police officer. He had a bad feeling that something might be wrong inside the unit, in part because he had never responded to a loud music call where the occupant was not at home. He had recently responded to a home where the house seemed fine from the outside but the resident had committed suicide. He felt it was his responsibility to enter the residence to determine if everything was all right inside. By way of radio, he spoke with his sergeant and advised him of the situation. His sergeant recommended kicking the door open, which he did.
After kicking the door open, Broxtermann and McAnnally entered the darkened residence with their guns drawn. They called out their presence but received no answer. They did not see anything extraordinary but the music was so loud inside that they could not hear anything else. They then searched the rooms. Inside the partially opened closet in one of the bedrooms, marijuana plants were found growing. Growing equipment was also found. With guns still drawn, the officers continued searching for possibly injured persons. In a second bedroom closet, they found additional marijuana plants and equipment for growing marijuana.
Based on the marijuana plants and equipment found inside the residence, the officers obtained and executed a search warrant.
Defendants, the residents of the unit, were charged by amended complaint with cultivating marijuana in violation of Health and Safety Code section 1358 and possessing marijuana for sale in violation of Health and Safety Code section 11359. The complaint further alleged appellant Weise was armed with a firearm during the offenses.[2] Defendants pleaded not guilty and Weise denied the armed allegation.
Both defendants filed a motion to suppress evidence under section 1538.5, which was granted. The magistrate dismissed the amended complaint and the superior court thereafter denied the People's motion to reinstate the amended complaint. This appeal by the People is taken pursuant to section 1238, subdivision (a)(9), from the decision of the superior court.

DISCUSSION

A.
Where, as here, the People appeal from the superior court's denial of a *317 motion to reinstate the amended complaint pursuant to section 1238, subdivision (a)(9), we are not bound by the substantial evidence standard of reviewing the trial court's decision. "Rather, ... in such review it is `the ultimate responsibility of the appellate court to measure the facts, as found by the trier, against the constitutional standard of reasonableness.' [Citation.] On that issue, in short, the appellate court exercises its independent judgment." (People v. Leyba (1981) 29 Cal.3d 591, 597, 174 Cal.Rptr. 867, 629 P.2d 961, fn. omitted; People v. Matelski (2000) 82 Cal. App.4th 837, 846, 98 Cal.Rptr.2d 543; see also People v. Massey (2000) 79 Cal. App.4th 204, 210, 93 Cal.Rptr.2d 890.) While review is not directly on the magistrate's granting of the motion to dismiss, if the magistrate's ruling was legally wrong, the superior court's decision was equally wrong. (People v. Matelski supra, 82 Cal. App.4th at p. 843, 98 Cal.Rptr.2d 543.)

B.
The search of a home conducted without a warrant is per se unreasonable unless it can be shown the search falls within one of the carefully defined exceptions to the Fourth Amendment. (Coolidge v. New Hampshire (1971) 403 U.S. 443, 474-475, 91 S.Ct. 2022, 29 L.Ed.2d 564.) These exceptions are carefully drawn and jealously guarded. (Jones v. United States (1958) 357 U.S. 493, 499, 78 S.Ct. 1253, 2 L.Ed.2d 1514.) At present, existing law permits police to enter a home without a warrant if, based upon the totality of circumstances facing them, the situation is "exigent," that is, the need to protect and preserve life or avoid serious bodily injury is present, justifying what would otherwise be an illegal entry. (Mincey v. Arizona (1978) 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290.)
The question presented on this appeal is whether there exists an exception to the warrant requirement which would allow the police to enter a house where they are concerned a resident may be in need of assistance. In the recent case of People v. Ray (1999) 21 Cal.4th 464, 88 Cal.Rptr.2d 1, 981 P.2d 928, such a warrantless police entry was upheld. In Ray, the police were called to a residence because the front door had been open all day and the inside was "a shambles." Officers were concerned for the welfare of the people inside. (Id. at p. 468, 88 Cal.Rptr.2d 1, 981 P.2d 928.) Officers approached the front door, which was open approximately two feet. In one officer's experience the circumstance correlated to a "95 percent" likelihood they had encountered a burglary or similar situation. Looking inside, the officer saw clothing and paper strewn on the floor and on the sofa. It appeared as if the front room had been ransacked. Although there were no signs of forced entry, these observations heightened both officers' apprehension. They believed a burglary attempt might be in progress and were concerned for the welfare of inhabitants. The officers knocked several times and loudly announced their presence. They received no response. Increasingly concerned, they entered to conduct a security check to see if anyone might be injured, disabled, or unable to obtain help. They found no one inside but in plain view did observe a large quantity of suspected cocaine and money. (People v. Ray, supra, 21 Cal.4th at p. 468, 88 Cal.Rptr.2d 1, 981 P.2d 928.) In a plurality opinion, three members of our highest court conclude there exists an emergency exit doctrine which is part of a "community caretaking" exception which would allow such entry. (Id. at pp. 467-480, 88 Cal.Rptr.2d 1, 981 P.2d 928.) As viewed by Justices Brown, Baxter and Kennard, the community caretaker exception finds its roots in the expanded functions of modern police forces in assuring the well being of the public as well as apprehension of criminals. The lead opinion in Ray thus offers two exceptions to the warrant requirement: exigent circumstances and the community caretaker exception of which the emergency aid doctrine is a subcategory. The opinion states: "Contrary to the view *318 of the Attorney General, however, the emergency aid doctrine is not a subcategory of the exigent circumstances exception to the warrant requirement. Rather, it is a subcategory of the community caretaking exception, a distinctly different principle of Fourth Amendment jurisprudence. `When the police act pursuant to the exigent circumstances exception, they are searching for evidence or perpetrators of a crime. Accordingly, in addition to showing the existence of an emergency leaving no time for a warrant, they must also possess probable cause that the premises to be searched contains such evidence or suspects. [Citations.] In contrast, the community caretaker exception is only invoked when the police are not engaged in crime-solving activities.' [Citations.] With respect to Fourth Amendment guaranties, this is the key distinction: `[T]he defining characteristic of community caretaking functions is that they are totally unrelated to the criminal investigation duties of the police.' [Citations.] Upon entering a dwelling, officers view the occupant as a potential victim, not as a potential suspect." (People v. Ray, supra, 21 Cal.4th at p. 471, 88 Cal.Rptr.2d 1, 981 P.2d 928.)
By separate opinion, three members of the Ray court, Chief Justice George and Justices Werdegar and Chin, conclude the entry was permissible under the traditional exigent circumstances doctrine. They do not opine or discuss whether any other exception to the warrant requirement exists or might be applicable on the facts of Ray. (People v. Ray, supra, 21 Cal.4th at pp. 480-482, 88 Cal.Rptr.2d 1, 981 P.2d 928.) In his dissenting opinion, Justice Mosk concludes there was no exigency and, further, rejects the creation of a community caretaker exception. (Id. at pp. 482-88, 88 Cal.Rptr.2d 1, 981 P.2d 928.)
Against this backdrop, we are called upon to decide whether there is a community caretaker exception to the warrant requirement and depending upon the conclusion reached, to discern whether here, there were sufficient grounds to enter defendants' home under either that exception or the exigency exception. We conclude there is no caretaker exception to the warrant requirement; however, on the facts of this case there were exigent circumstances allowing the officers to enter and conduct a cursory search to determine the well being of the occupants.
We begin by acknowledging that beyond a doubt, police officers have duties which are based upon their role as community caretakers. As the United States Supreme Court has recognized in the context of automobile seizures, police often engage in activities intended to benefit the public which are "totally divorced from detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." (Cody v. Dombrowski (1973) 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706.) We find no case, however, extending this broad exception to homes. Indeed, it appears those cases allowing the warrantless entry of residences have done so where some form of traditional exigency exists. We decline to unnecessarily divide this exigency exception into categories. We believe to do so would weaken the well-established limited basis which permits warrantless entry into residences.
Contrary to the People's position, the cases cited by them do not support the proposition that mere caretaker interest, without immediate threat to human life or personal injury, or need to thwart a crime, supports warrantless entry. We are pointed to no case where, absent one of these elements, warrantless entry was deemed constitutional. Rather, in the cases cited, "exigency" is defined more broadly than immediate pursuit of criminals. It extends to those actions necessary to protect and preserve life even where pursuit of criminals or prevention of crime were not involved. Thus in People v. Roberts (1956) 47 Cal.2d 374, 303 P.2d 721, the police *319 entered to render emergency aid after being told the occupant was ill and they could hear moans and groans coming from the apartment. Several cases have allowed warrantless entry where a recent crime occurred in the area and bloodstains were present around or leading into the residence. (See People v. Hill (1974) 12 Cal.3d 731, 117 Cal.Rptr. 393, 528 P.2d 1; People v. Amaya (1979) 93 Cal.App.3d 424, 155 Cal.Rptr. 783; People v. Poulson (1998) 82 Cal.Rptr.2d 605, 69 Cal.App.4th Supp. 1.) Others have allowed entry where police are asked by relatives or co-workers to check on the welfare of residents who have not adhered to normal activities, or have not been seen, and where they have conducted such checks have made observations leading them to conclude the residents' health and welfare is then at risk, requiring immediate intervention or investigation. (See People v. Amnions (1980) 103 Cal.App.3d 20, 162 Cal.Rptr. 772 [police were asked to investigate nonappearance at work, resident had heart condition, cars were in garage and family dog, which was usually cared for by neighbors when the residents were away, was seen in the home and had defecated on the floor].) Finally, in People v. Cain (1989) 216 Cal. App.3d 366, 264 Cal.Rptr. 339, a warrantless entry was allowed where a violent rape had occurred next door, there was no response to a knock on the door by police and opening of the door revealed from outside the residence there was a body on the floor.
On the other hand, cases have held warrantless entry illegal where loud music and lights alone were the basis of the entry (Horack v. Superior Court (1970) 3 Cal.3d 720, 91 Cal.Rptr. 569, 478 P.2d 1) and where a child found crying outside the residence prompted an entry to assure the child's well-being. (People v. Smith (1972) 7 Cal.3d 282, 101 Cal.Rptr. 893, 496 P.2d 1261.)
While we recognize we depart from the lead opinion in Ray, we find, absent exigency requiring immediate apprehension of criminals, curtailing a crime or acting to prevent death or injury to human life, a warrantless entry into a residence is prohibited by the Fourth Amendment.
The question remains whether the officers here were confronted with an exigent situation. We conclude they were and hence the entry was proper. The officers were confronted not only with loud music as was the situation in Horack, but with music so loud the neighbors could not bear it and, indeed, so loud that in the course of the investigation it caused Officer Broxtermann to get a headache. Moreover, it was not music which one could conclude had been turned on while the residents were temporarily away. It had been playing at the same level for 24 hours. Neighbors considered it unusual for the residents. At least one neighbor was concerned for the safety of the occupants. In addition, mail and newspapers had piled up for several days. All reasonable efforts to contact the residents failed. Under such circumstances and given the experience and concerns of the officers, we conclude it was reasonable for the officers to enter to determine whether the residents were well or had met with foul play.
The further question to be addressed is whether once inside it was proper for the officers to open closet doors to inspect their interior. The first closet was opened in order to determine if an injured or perhaps dead individual was inside. Indeed, when Officer Broxtermann saw a dim light coming from the first closet, his gun was out because he "wasn't sure what [he was] going to find there." Although marijuana plants were found, his gun remained out when he went to the second closet and opened it because it was the "same situation." Because the search for possibly injured individuals justified the officers' entry into the home and closets, the marijuana found in plain sight could be legally seized. (People v. Block (1971) 6 Cal.3d 239, 243, 103 Cal.Rptr. 281, 499 P.2d 961.)
*320 The superior court's refusal to grant the People's motion under section 871.5 was erroneous. The superior court's order is reversed and it is directed to return the case to the magistrate with orders to resume the proceedings within 10 days pursuant to section 871.5, subdivision (e).
McINTYRE and O'ROURKE, JJ., concur.
NOTES
[*] In denying review, the Supreme Court ordered that the opinion be not officially published. (See California Rules of CourtRules 976 and 977).
[1] All further statutory references are to the Penal Code.
[2] The parties do not discuss the evidence supporting this allegation. Nor was a weapon introduced as evidence in any hearing below.