Filed 3/12/20

CERTIFIED FOR PUBLICATION

OPINION AFTER TRANSFER FROM THE CALIFORNIA SUPREME COURT

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D075372 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. Nos. INF1402881, INF1600417) |
| SKYLER DAMON SMITH, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County. Jeffrey L. Gunther, Judge. (Retired Judge of the Sacramento Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.) Affirmed in part and reversed in part and remanded for resentencing.

Ava R. Stralla, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles Raglan, Scott Taylor, and Laura Baggett, Deputy Attorneys General, for Plaintiff and Respondent.

In December 2014, police entered a casita belonging to Skyler Damon Smith and saw drugs in plain view. The Riverside County District Attorney filed an information charging Smith with possessing heroin (Health & Saf. Code, § 11350, subd. (a); count 1), possessing methamphetamine (Health & Saf. Code, § 11377, subd. (a); count 2), possessing methamphetamine while armed with a loaded firearm (Health & Saf. Code, § 11370.1; count 3), being armed with an assault weapon (Pen. Code,[1] § 30605, subd. (a); count 4), and being a felon in possession of a firearm (Pen. Code, § 29800, subd. (a)(1); count 5; case No. INF1402881, the first case). The trial court subsequently denied Smith's suppression motion relating to the search of his casita.

In September 2015, Smith was in an accident while riding his motorcycle. A search of the motorcycle revealed drugs. In December 2016 (case No. INF1600417, the second case), Smith was charged with possessing methamphetamine (Health & Saf. Code, § 11378; count 1), sale or transport of methamphetamine (Health & Saf. Code, § 11379, subd. (a); count 2), possessing methamphetamine while armed with a loaded firearm (Health & Saf. Code, § 11370.1; count 3), being a felon in possession of a firearm (Pen. Code, § 29800, subd. (a)(1); count 4), and being a felon in possession of ammunition (Pen. Code, § 30305, subd. (a); count 5).

The trial court granted the People's motion to consolidate the cases, and the first amended information included all 10 counts. The People further alleged that Smith suffered two prison priors (§ 667.5, subd. (b)). During trial, the court denied a second suppression motion concerning a search of Smith's motorcycle in the second case.

---

[1]     Undesignated statutory references are to Penal Code.

A jury found Smith guilty of all counts and the court found true the two prison priors. The trial court sentenced Smith to 10 years eight months in prison. Smith appealed, asserting the court erred in denying his suppression motions. Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), Smith also argued that the trial court could not legally impose a $10,000 restitution fine and a $300 court facilities assessment fee without first determining his ability to pay.

In an opinion issued in May 2019, we affirmed the judgment. Smith petitioned our Supreme Court for review. The Supreme Court granted review and transferred the matter to us with directions to vacate our decision and reconsider the cause in light of *People v. Ovieda* (2019) 7 Cal.5th 1034 (*Ovieda*).

In the meantime, our Legislature enacted Senate Bill No. 136, (Stats. 2019, ch. 590), which amended section 667.5, subdivision (b) to limit one-year prior prison terms to cases where the prior was for "a sexually violent offense as defined in subdivision (b) of Section 6600 of the Welfare and Institutions Code[.]" The amendment became effective on January 1, 2020. (Cal. Const., art. IV, § 8, subd. (c).)

We received and considered supplemental briefing from the parties. Smith argues that the warrantless entry into his casita was objectively unreasonable because an unattended car running in a driveway did not constitute exigent circumstances or suggest a medical emergency, claiming that the officer acted upon an unparticularized suspicion devoid of articulable facts. We agree and conclude that the evidence seized during this warrantless search should have been suppressed because the People did not meet their burden to justify the search under the emergency aid or exigent circumstances exceptions,

3

or the good faith exception to the exclusionary rule. Accordingly, we reverse Smith's convictions on counts 1 through 5, but otherwise affirm the judgment.

Smith also contends that his one-year prior prison term enhancements imposed on two prior convictions pursuant to section 667.5, subdivision (b) must be stricken in light of Senate Bill No. 136. The Attorney General concedes this issue. We find the Attorney General's concession appropriate. We vacate our original opinion issued May 31, 2019, and issue this revised opinion addressing Smith's arguments in section II and newly added section V.

DISCUSSION

I. *GENERAL LEGAL PRINCIPLES*

The Fourth Amendment to the United States Constitution prohibits the government from conducting unreasonable searches and seizures of private property. (U.S. Const., 4th amend.; *Arizona v. Gant* (2009) 556 U.S. 332, 338; *People v. Macabeo* (2016) 1 Cal.5th 1206, 1213.) Warrantless searches "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." (*Katz v. United States* (1967) 389 U.S. 347, 357, fns. omitted.) As relevant here, well-delineated exceptions to the warrant requirement include exigent circumstances, inventory searches, and plain-view searches. (68 Am.Jur.2d (2010) Searches and Seizures § 114, p. 237.)

A defendant may move to suppress evidence on the ground that "[t]he search or seizure without a warrant was unreasonable." (§ 1538.5, subd. (a)(1)(A).) When a defendant files a motion to suppress, the People have "the burden of proving that the

4

warrantless search or seizure was reasonable" (*People v. Williams* (1999) 20 Cal.4th 119, 130), and alternatively, " 'the burden . . . to prove that exclusion of the evidence is not necessary because of [the good faith] exception.' " (*People v. Willis* (2002) 28 Cal.4th 22, 36.) The prosecution must establish by a preponderance of the evidence the facts justifying a warrantless search. (*People v. Johnson* (2006) 38 Cal.4th 717, 729.) In reviewing a court's ruling on a suppression motion, "[w]e defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment." (*People v. Glaser* (1995) 11 Cal.4th 354, 362.)

## II. *FIRST CASE: CASITA SEARCH*

A. *Background Facts*[2]

An officer with the Palm Springs Police Department and his partner were dispatched to a home following a call from a concerned citizen. The citizen reported that an unoccupied running car had been in the driveway of a residence for about 30 minutes. The officer met the citizen by the car and noted that the unoccupied car was running, the windows were up and foggy, the lights were on, and determined that a car rental company owned the vehicle. The officer became concerned that a person inside the home might be in distress or that criminal activity was afoot. The officer testified that his duties include welfare checks and that he had experienced a prior incident with similar

---

[2] The facts are based on the testimony given in connection with the suppression motion.

circumstances where a person had been suffering from a diabetic coma. The officer heard no noise inside the house. The officer rang the doorbell several times and could hear the doorbell ringing inside the home. The officer or his partner also knocked on the door. The officers waited about 30 to 60 seconds for someone to answer the door, but received no response. The lack of any response concerned the officer.

The officers left the front door and walked the exterior of the residence to determine if an occupant was injured or crime was afoot. About 10 feet away from the front door and under the same roofline the officer found a second door that appeared to be "an interior-type door" which led the officer to believe that the door was "part of and open to the main residence." The officer did not knock on the door, but moved the handle. The officer did not knock because he had no reason to believe doing so would alert anyone inside the residence. The officer did not know the interior layout of the house and did not know that the door led to a casita that lacked access to the front door.

Finding the door unlocked, the officer opened the door and announced "police." As the door opened, the officer saw an individual, who he knew to be a felon and not a resident of this home, lying on the floor looking back at him. This caused the officer to believe that crime was afoot.

After a "factually intense" analysis, the trial court denied the suppression motion. The court found the officer's testimony to be "very sincere, very honest" regarding the description of the scene and the officer's concerns. The court found that the officers waited a substantial period of time for a response after they rang the doorbell and knocked. The court concluded that the officer's failure to knock on the second door

6

before entering was not unreasonable given "this was a one-roof situation.  It wasn't the separate casita, which we see in this community on many occasion[s].  This was a contiguous part of the entirety of one structure . . . ."

During trial, the officer testified that after stepping into the room he saw Smith, another individual who he knew had a felony conviction, drug paraphernalia and what appeared to be methamphetamine in plain view.  He later learned that Smith and the other individual were on probation and subject to search conditions.

B.  *Legal Principles*

At " 'the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' " (*Payton v. New York* (1980) 445 U.S. 573, 589-590.)  Accordingly, "the Fourth Amendment has drawn a firm line at the entrance to the house."  (*Id.* at p. 590.)  Thus, "[w]ith few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no."  (*Kyllo v. United States* (2001) 533 U.S. 27, 31.)

Pursuant to the emergency aid exception, "police may enter a home without a warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury."  (*Brigham City v. Stuart* (2006) 547 U.S. 398, 400; *People v. Troyer* (2011) 51 Cal.4th 599, 606.)  Additionally, "the exigent circumstances exception applies to situations requiring prompt police action.  These situations may arise when officers are responding to or investigating criminal activity."  (*Ovieda*, *supra*, 7 Cal.5th at p. 1042.)

7

Additionally, in *People v. Ray* (1999) 21 Cal.4th 464 (*Ray*), a plurality of our high court held that the community-caretaker exception, which permits police to enter if the search is unrelated to the criminal investigation duties of the police, justified the warrantless entry into a home for a security check. (*Id.* at p. 471 (lead opn. of Brown, J.).) In *Ray*, someone had called police and reported that a neighbor's front door " 'has been open all day and it's all a shambles inside.' " (*Id.* at p. 468 (lead opn. of Brown, J.).) Officers responded, saw the open door, and confirmed that " 'the front room appeared to be ransacked as if someone went through it.' " (*Ibid.*) Officers knocked and announced their presence but received no reply. They then entered "to conduct a security check 'to see if anyone inside might be injured, disabled, or unable to obtain help.' " (*Ibid.*) The officers found no occupants, but saw drugs and cash in plain view. They left and obtained a search warrant. (*Id.* at pp. 468-469 (lead opn. of Brown, J.).)

A plurality of the Supreme Court concluded that while the facts known to the officers did not establish "exigent circumstances or the apparent need to render emergency aid, they warranted further inquiry to resolve the possibility [that] someone inside required assistance or property needed protection." (*Ray*, *supra*, 21 Cal.4th at p. 478 (lead opn. of Brown, J.).) The lead opinion then pronounced that "[u]nder the community caretaking exception, circumstances short of a perceived emergency may justify a warrantless entry, including the protection of property, as 'where the police reasonably believe that the premises have recently been or are being burglarized.' " (*Id.* at p. 473 (lead opn. of Brown, J.).) Under this exception, the question is: "Given the known facts, would a prudent and reasonable officer have perceived a need to act in the

proper discharge of his or her community caretaking functions?" (*Id.* at p. 477 (lead opn. of Brown, J.).)[3]

In *Ovieda*, *supra*, 7 Cal.5th 1034, the California Supreme Court disapproved the lead opinion in *Ray*, *supra*, 21 Cal.4th 464, holding that "the community caretaking exception asserted in the absence of exigency is not one of the carefully delineated exceptions to the residential warrant requirement recognized by the United States Supreme Court." (*Ovieda*, at p. 1053.)

C. *Analysis*

The question before us is whether exigent circumstances justified the warrantless search. Exigent circumstances are defined as " ' " 'an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence.' " ' " (*Ovieda*, *supra*, 7 Cal.5th at p. 1041.) Exigent circumstances include situations where "an entry or search appears reasonably necessary to render emergency aid, whether or not a crime might be involved." (*Id.* at pp. 1041-1042.) We separately analyze whether the emergency aid or the exigent circumstances exceptions apply. Finding they do not apply, we address the

---

3    In *Ray*, a separate three-justice concurrence rejected the lead opinion's community caretaking rationale, but agreed in the result that the entry was proper finding "[e]xigent circumstances existed, because the officers had reasonable cause to believe a burglary was in progress, or that a burglary had been committed and there might be persons inside the residence in need of assistance." (*Ray*, *supra*, 21 Cal.4th at p. 482 (conc. opn. of George, C. J.).) The dissent concluded that "[t]he circumstances did not warrant a reasonable belief that entry was necessary to preserve life or property. To the extent that the officers believed they were called upon to perform a community caretaking function, it would have sufficed to shut the door." (*Id.* at p. 487 (dis. opn. of Mosk, J.).)

People's contention that the good faith exception to the exclusionary rule should apply to validate the search.

1. Emergency Aid Exception

The well-recognized emergency aid exception "require[s] that articulable facts support a reasonable belief that an emergency exists." (*Ovieda*, *supra*, 7 Cal.5th at p. 1048.) It is not enough that officers seek to rule out "the possibility that someone . . . might require aid." (*Id.* at p. 1047.) "Officers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." (*Michigan v. Fisher* (2009) 558 U.S. 45, 49 (*Fisher*).) "[T]he test . . . [is] whether there was 'an objectively reasonable basis for believing' that medical assistance was needed, or persons were in danger . . . ." (*Ibid.*)

*People v. Smith* (1972) 7 Cal.3d 282 (*Smith*) is instructive. In *Smith*, an apartment house owner found the six-year-old daughter of one of her tenants crying on the steps to the girl's apartment. (*Id.* at p. 284.) The girl stated that she was alone in her apartment and lonesome. (*Ibid.*) The owner took the girl in and contacted the police after waiting one hour. (*Ibid.*) The responding officer went to the girl's apartment looking for her mother. (*Ibid.*) After receiving no response to his knocks, the officer had the owner of the apartment house open the door. (*Ibid.*) He entered and found drugs inside. (*Ibid.*)

The California Supreme Court found the entrance to be illegal. "[R]ather than drawing the obvious conclusion that no one was at home [citation], [the officer] proceeded to speculate that [the mother] might nevertheless be inside but be unable to answer because she was somehow indisposed and, by that token, in need of 'help.'

10

This . . . attempt to create an emergency where none existed is . . . implausible. . . . There was not a scintilla of evidence to support the assumption that [the mother] had not only returned unnoticed to her flat but had thereupon suddenly fainted, fallen sick, or otherwise become incapacitated to the point of rendering her unable to care for her daughter and in need of police assistance. Such a belief is no less irrational than that entertained by the officer in *Horack* [*v. Superior Court of Orange County* (1970) 3 Cal.3d 720, 725 (*Horack*)] who received no response when he knocked on the door of an apparently empty house, and 'because there was no response, he believed the persons were intentionally failing to open the door; because they were consciously refusing to open the door, he believed they had something to hide, namely, that they were occupying the house without authority.' [Citation.] In both cases the belief upon which the officer acted was the product not of facts known to or observed by him, but of his fanciful attempt to rationalize silence into a justification for his warrantless entry." (*Smith*, *supra*, 7 Cal.3d at p. 287.)

Similarly here, absolutely no evidence supported a conclusion that anything was amiss inside the residence. The officers observed an unoccupied running vehicle in a residential driveway at night and what appeared to be an unoccupied dark residence with the porch light on and front door locked. No one responded to the doorbell or knocks at the door and the officer could not see or hear anything inside the house. On these facts, the officer expressed concern that someone inside the residence might be having a medical emergency.

11

However, as required by *Ovieda*, *supra*, 7 Cal.5th 1034, the officer pointed to no facts that reasonably supported his concern that someone inside the residence might be suffering from a medical emergency such as moaning or groaning from inside the home, blood or vomit near the vehicle or residence, or disarray inside the vehicle or near the home.  Rather, the facts known to the officer were insufficient to provide him with " 'an objectively reasonable basis for believing' that medical assistance was needed, or persons were in danger" such that a warrantless search of the residence was justified by the emergency aid exception.  (*Fisher*, *supra*, 558 U.S. at p. 49; compare, *People v. Roberts* (1956) 47 Cal.2d 374, 376 [warrantless entry proper where officers had information that a person living inside apartment "was sickly" and heard "several moans or groans" after knocking on door]; *People v. Hill* (1974) 12 Cal.3d 731, 755 [warrantless entry proper when officers, aware of a recent shooting, found one victim and then found fresh bloodstains on the fence and porch of a residence, received no response to their knocks and observed what appeared to be bloodstains on the floor inside the residence], overruled on other grounds in *People v. DeVaughn* (1977) 18 Cal.3d 889, 896, fn. 5; *People v. Ammons* (1980) 103 Cal.App.3d 20, 30-31 [Officer had rational basis for warrantless entry where "[b]oth cars were home; defendant was usually home on Monday morning; the dog was left unattended long enough to defecate on the floor.  Usually a neighbor cared for the dog when the Ammons were away.  Contrary to their custom, the Ammons had not told this neighbor that they would be away from home.  The victim, normally a punctual employee, was several hours late for work and had not called; his employer expressed concern for his welfare.  Defendant had a heart condition for which

12

she was under a doctor's care and was taking medication. The Ammons neighbors had not seen them for two days. Their daughter was on vacation and could not be reached."]; *People v. Amaya* (1979) 93 Cal.App.3d 424, 427 [after report of shooting and finding one dead victim, warrantless search of apartment which had a fresh trail of blood leading to it upheld].)

Unlike the above cases, the officer here articulated no facts reasonably suggesting that someone inside the residence might be having a medical emergency. Accordingly, we conclude that the emergency aid exception did not justify the warrantless entry into Smith's casita.

2. Exigent Circumstances Exception

"A burglary in progress may constitute an 'exigent circumstance,' as that phrase is used in Fourth Amendment jurisprudence." (*People v. Lujano* (2014) 229 Cal.App.4th 175, 183.) On this point, *People v. Duncan* (1986) 42 Cal.3d 91 (*Duncan*) and *Horack*, *supra*, 3 Cal.3d 720 are instructive.

In *Duncan*, *supra*, 42 Cal.3d 91, a police officer responded to a "call that a burglary was in progress or had just occurred[,]" at a residence and spoke to a neighbor, who apparently told the officer he saw two teenagers fleeing with a television set. (*Id.* at p. 95.) The police officer noticed an open back window with a television set and other items beneath it. (*Id.* at pp. 95-96.) "Surmising that one or more of the burglars was still inside," the officer climbed in the window "to search for intruders" and saw a drug laboratory. (*Id.* at p. 96.) The trial court denied the defendants' motion to suppress and the California Supreme Court affirmed, concluding the police officer's "warrantless entry

13

into defendants' residence was justified by the exigent circumstance of a burglary in progress." (*Id*. at p. 98.) The *Duncan* court concluded substantial evidence supported the trial court's finding that the police officer reasonably believed at least one burglar was inside the house and observed it "would have been poor police work indeed for an officer to fail to investigate under circumstances suggesting a crime in progress." (*Id.* at pp. 98-99.)

In *Horack*, *supra*, 3 Cal.3d 720, an officer received a call that two " 'hippie-type' " individuals had entered what the caller believed was a vacant house with sleeping bags. (*Id.* at p. 723.) The officer went to the house around 1:00 p.m., knocked and announced " 'Police Officer.' " (*Ibid.*) He could see there were no furnishings in the house except a stereo which was playing loudly. (*Ibid.*) No one responded to his knocks, and he heard no other sounds from within. (*Ibid.*) The front door was locked. The back door was unlocked, and the officer entered to " 'ascertain if there were people in the dwelling that did not have the authority to be inside.' " (*Ibid.*) Our high court found the search to be unreasonable. "The only property to be protected was the bare carpeted house containing a stereo system, and the police officers saw nothing to indicate any immediate threat of damage or destruction. Indeed, [the officer] candidly admitted that he saw nothing to indicate that a burglary was in progress or had been committed. And even the most vivid imagination would be unable to contrive imminent danger to human life in the situation apparent to [the officers] prior to their entry." (*Id.* at p. 726.)

The instant case is more similar to *Horack* than *Duncan*. The neighbor who reported the running car in the driveway did not see anyone fleeing the residence, or state

that the neighborhood had a burglary problem. The lit porch light, locked front door, and dark interior suggested that the home was occupied, but that the occupants were not home. Moreover, an overview of the residence's exterior did not reveal any open doors or windows, flashlight beams in the home, or anything amiss. Here, while the unoccupied running car warranted investigation, it did not reasonably suggest a burglary in progress and justify a warrantless search. Common sense suggests that burglars would not announce their presence by leaving an unoccupied running getaway vehicle in the driveway of the residence being burglarized.

Our search of state and federal case law revealed the existence of no cases where an unoccupied running vehicle prompted the search of a residence. However, we find *People v. Hernandez* (1994) 30 Cal.App.4th 919 (*Hernandez*) somewhat analogous. In *Hernandez*, an undercover officer purchased narcotics from a suspected drug dealer during an undercover narcotics investigation. (*Id.* at p. 921.) Officers later observed the two vehicles driven by the suspected drug dealer at the time of the controlled buys parked behind a residence. (*Ibid.*) Undercover officers knocked on the door of the residence and spoke to the occupants, but were unable to ascertain whether the suspect lived there. (*Id.* at p. 922.) The officers obtained a search warrant for the residence based on the presence of the vehicles behind the residence; no information was provided that the suspected drug dealer ever entered the residence. (*Id.* at pp. 923-924.)

The Court of Appeal concluded that probable cause to issue the search warrant did not exist because the presence of the vehicles "raised suspicions, but failed to establish a nexus between the criminal activities and the residence." (*Hernandez*, *supra*, 30

15

Cal.App.4th at p. 924.)  The *Hernandez* court observed there was no link between the vehicles and the residence, noting the absence of information that the suspect owned the vehicles, lived at the residence, or was ever seen carrying packages between the vehicles and the residence.  (*Ibid.*)  Thus, "there was no substantial basis for concluding that probable cause existed for the residential search."  (*Ibid.*; accord, *People v. Garcia* (2003) 111 Cal.App.4th 715, 722 [insufficient nexus between drug dealer who sold drugs in a bar and the possible presence of drugs in the bar to support issuance of search warrant where the drug dealer was a patron, not an owner or employee of the bar and there was no evidence the drug dealer stored drugs at the bar].)

Applying the reasoning in *Hernandez*, while the unoccupied running car warranted investigation, no articulable facts existed to create a nexus between any suspected criminal activities and the residence.  Accordingly, we conclude that the exigent circumstances exception did not justify the warrantless entry.

3.  Good Faith Exception

"Under the 'fruit of the poisonous tree' doctrine, both direct and indirect products of an unreasonable search are subject to exclusion."  (*People v. Werner* (2012) 207 Cal.App.4th 1195, 1213.)  Nonetheless, "[t]he United States Supreme Court has 'repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation.'  [Citations.]  'Indeed, exclusion "has always been our last resort, not our first impulse . . . ." '  [Citation.]  [¶]  'Whether the exclusionary sanction is appropriately imposed in a particular case . . . is "an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were

16

violated by police conduct." ' " (*Barajas v. Appellate Division of Superior Court* (2019) 40 Cal.App.5th 944, 952-953.)

Anticipating the possibility that we might find the warrantless entry unjustified, the People tacitly concede that the search of the casita violated the Fourth Amendment and contend we should affirm the denial of the suppression motion based on the good faith reliance doctrine, citing *Hudson v. Michigan* (2006) 547 U.S. 586, 591 (*Hudson*), *Herring v. United States* (2009) 555 U.S. 135, 140 (*Herring*), and *Davis v. United States* (2011) 564 U.S. 229, 237 (*Davis*).

In *Hudson*, *supra*, 547 U.S. 586, police obtained a valid warrant to search defendant's home. (*Id*. at p. 588.) Instead of waiting the appropriate amount of time after knocking and announcing, police entered the home and recovered narcotics and a firearm. (*Ibid.*) Defendant claimed that the evidence should be suppressed based on a clear violation of the Fourth Amendment. (*Ibid.*) A Supreme Court majority disagreed reasoning that police obtained the evidence pursuant to a valid search warrant and courts could sever the method of the search (which might have been a constitutional violation), from the justification for the search (which was constitutionally valid). (*Id*. at pp. 592-593.)

In *Herring*, *supra*, 555 U.S. 135, police arrested defendant when a computer search revealed that defendant had an active warrant. (*Id*. at p. 137.) During a search incident to defendant's arrest, police recovered narcotics and a gun. (*Id.* at p. 138.) After the search, the officer learned that the warrant had been recalled. (*Ibid*.) Balancing the costs and benefits of exclusion (*id*. at p. 141), the court concluded that the deterrent value

17

of the exclusionary rule turns on the "flagrancy" of police misconduct. (*Id.* at p. 143.) "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." (*Id.* at p. 144.) Our high court declined to exclude the evidence stating "that when police mistakes are the result of negligence such as that described here, rather than systemic error or reckless disregard of constitutional requirements, any marginal deterrence does not 'pay its way.' " (*Id.* at pp. 147-148.)

In *Davis*, *supra*, 564 U.S. 229, an officer searched a car and recovered contraband in accordance with a controlling United States Supreme Court case that created a "bright-line rule authorizing the search of a vehicle's passenger compartment incident to a recent occupant's arrest," which was later held unconstitutional by the United States Supreme Court. (*Id.* at pp. 239, 233-235.) The Supreme Court concluded that the exclusionary rule should not apply, reasoning that the police officer's actions, although later declared unconstitutional, were at the time perfectly legal and quite reasonable. (*Id.* at p. 249.) Thus, there was no deterrent value in suppressing evidence recovered from a then-lawful search. (*Ibid.*) As another court explained, the *Davis* rule avoids penalizing law enforcement officers for errors of appellate judges. (*People v. Youn* (2014) 229 Cal.App.4th 571, 579.) Rather, where police officers are complying in good faith with the law as it existed at the time, there is no reason to apply the exclusionary rule. (*Ibid.*)

The People argue that the officer who entered the casita was not culpable because he relied in good faith on the community caretaking exception articulated in *Ray*, *supra*, 21 Cal.4th 464. This argument is misplaced because "[t]he pertinent analysis of

18

deterrence and culpability is objective, not an 'inquiry into the subjective awareness of arresting officers.' " (*Herring*, *supra*, 555 U.S. at p. 145.)  The sole question is whether the search was objectively reasonable under binding legal precedent at the time of the search.  Unlike the binding United States Supreme Court precedent at issue in *Davis*, *supra*, 564 U.S. 229, *Ray* was a plurality decision and is not binding precedent.  (*Texas v. Brown* (1983) 460 U.S. 730, 737 [plurality opinion not binding precedent]; *People v. Karis* (1988) 46 Cal.3d 612, 632 [opinion "is not binding precedent since a majority of the court did not join in the plurality opinion"].)

Accordingly, we cannot conclude that the officer's actions were constitutional under existing legal authority at the time of the search.  Applying the good faith exception here would allow police officers to undertake warrantless searches of residences based on nonbinding legal precedent.  Additionally, not applying the good faith exception to this circumstance would act to deter similar searches based on nonbinding legal precedent and devoid of articulable facts justifying the search.  Thus, we conclude that the good-faith exception to the exclusionary rule does not apply, and suppression of the evidence obtained during the warrantless search of Smith's casita is required.[4]

---

[4]    *People v. Harris* (2015) 234 Cal.App.4th 671 (*Harris*), relied on by the People for application of the good faith exception is inapposite.  The *Harris* court noted that for over 40 years, California courts had interpreted a United States Supreme Court opinion to permit forced, warrantless blood draws of motorists arrested on suspicion of DUI without any additional showing of exigent circumstances.  (*Id.* at pp. 702-704.)  After the search at issue, another United States Supreme Court opinion repudiated this long-standing interpretation.  (*Id.* at p. 703.)  Under these circumstances, the *Harris* court concluded

### III.  *SECOND CASE:  MOTORCYCLE SEARCH*

#### A.  *Background Facts*

During trial, Smith moved to suppress any evidence seized after police searched his motorcycle.  Outside the jury's presence, the trial court heard testimony from an officer with the traffic division of the Palm Springs Police Department (the traffic investigator) who responded to a traffic collision involving a motorcycle.  The motorcycle was blocking the roadway and needed to be towed away.  Smith, the motorcycle driver, had already been transported to the hospital when the traffic investigator arrived at the scene.

The traffic investigator needed to impound the motorcycle as part of the traffic collision investigation.  The impound process included completing a California Highway Patrol 180 form documenting the towing and inventory search of the vehicle.  An inventory search is normal procedure for a towed vehicle.  The inventory search included determining the existence of valuable property, contraband, weapons, or any other items that could be dangerous to individuals with access to a tow yard where the vehicle may be left unsecured.  The traffic investigator stated that the motorcycle would be taken to a police storage yard.

Before conducting the inventory search, the traffic investigator learned that hospital personnel had found a firearm on Smith.  The traffic investigator performed a visual check of the motorcycle and noticed a single storage compartment underneath the

---

that the good faith exception applied to the warrantless blood draw at issue.  (*Id.* at pp. 702-703.)

seat. The storage compartment was large enough to house a handgun or ammunition. The officer unlocked the compartment using the ignition key. The compartment contained a black zippered bag. The black bag contained a wallet, sunglasses, and a white plastic baggie with a substance the officer believed to be methamphetamine.

The trial court found that the contents of the motorcycle needed to be inventoried to determine whether the motorcycle contained anything valuable. It rejected the defense argument that the traffic investigator was looking for contraband and not performing a required inventory search. Based on these findings, the court denied the suppression motion, concluding that the traffic investigator had conducted a lawful inventory search.

B. *Legal Principles*

Vehicle inventory searches are "a well-defined exception to the warrant requirement of the Fourth Amendment." (*Colorado v. Bertine* (1987) 479 U.S. 367, 371 (*Colorado*).) An inventory search may extend to the car's trunk, glove compartment, and closed containers located within the car. (*Id.* at p. 375.) "A police officer may be allowed sufficient latitude to determine whether a particular container should or should not be opened in light of the nature of the search and characteristics of the container itself." (*Florida v. Wells* (1990) 495 U.S. 1, 4 (*Florida*).)

Inventory searches are typically performed by police when vehicles are impounded "[i]n the interests of public safety and as part of . . . 'community caretaking functions.' " (*South Dakota v. Opperman* (1976) 428 U.S. 364, 368 (*Opperman*).) "When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobiles' contents. These procedures

21

developed in response to three distinct needs:  the protection of the owner's property while it remains in police custody, [citation]; the protection of the police against claims or disputes over lost or stolen property, [citation]; and the protection of the police from potential danger."  (*Id.* at p. 369.)  "Whether 'impoundment is warranted under this community caretaking doctrine depends on the location of the vehicle and the police officers' duty to prevent it from creating a hazard to other drivers or being a target for vandalism or theft.' "  (*People v. Williams* (2006) 145 Cal.App.4th 756, 761 (*Williams*).)

To protect Fourth Amendment interests, inventory searches, and in particular the opening of closed containers, must occur pursuant to "standardized criteria" or an "established routine."  (*Florida*, *supra*, 495 U.S. at p. 4; *Williams*, *supra*, 145 Cal.App.4th at p. 761.)  The requirement of guidelines for police discretion insures that inventory searches are not used as "a ruse for a general rummaging in order to discover incriminating evidence."  (*Florida*, at p. 4; *Williams*, at p. 761.)

C. *Analysis*

Smith concedes that the police properly impounded his motorcycle as part of their community caretaking function. He contends that opening the locked compartment under the passenger seat of his motorcycle was unnecessary and a pretext for an investigation of criminal activity because the traffic investigator stated that the motorcycle would be taken to a police storage yard. Accordingly, he claims the trial court erred when it denied the motion and failed to exclude the methamphetamine recovered during the search. We disagree.

Police inventory the contents of an impounded vehicle to document and secure valuable items and thus protect the police against claims or disputes regarding lost or stolen property. (*Opperman*, *supra*, 428 U.S. at p. 369.) Here, the traffic investigator testified that an inventory search to record the existence of valuable items is normal procedure for a towed vehicle and that such searches are documented by filling out a standard form. The traffic investigator testified that his search was consistent with police procedures, including a visual inspection and unlocking a storage compartment. These facts amply support the trial court's findings that the traffic investigator performed a required inventory search, that the search was not a pretext to look for contraband, and not performing the search would have resulted in uncertainty whether the motorcycle contained anything valuable.

The traffic investigator's use of the ignition key to unlock the storage compartment makes the opening of this compartment akin to opening a car trunk, which is permissible. (*Colorado*, *supra*, 479 U.S. at p. 375 [inventory search may extend to a car trunk and

23

closed containers located within the car].)  The fact the motorcycle would be towed to a police storage yard rather than a tow yard (a presumably less secure location), is a distinction without a difference.  Police may potentially be liable for lost or stolen items, particularly valuables such as Smith's wallet, regardless of where the vehicle is stored.  Accordingly, the trial court reasonably concluded that the traffic investigator had performed a lawful inventory search aimed at securing the motorcycle and its contents.

## IV.  *ABILITY TO PAY*

Smith contends that the trial court erred by imposing a $300 court facilities assessment (Gov. Code, § 70373), a $10,000 restitution fine (Pen. Code, § 1202.4, subd. (b)), and a stayed $10,000 parole revocation fine (Pen. Code, § 1202.45) without determining his ability to pay.  He contends that the issue is not forfeited because the trial court made a legal error at sentencing, not a discretionary error, and it would have been futile to object.

The minimum restitution fine for felony convictions is $300, and the maximum fine is $10,000.  (§ 1202.4, subd. (b)(1).)  A trial court may consider inability to pay when "increasing the amount of the restitution fine in excess of the minimum fine . . . ." (§ 1202.4, subd. (c).)  It is well established that a defendant forfeits a challenge to the trial court's imposition of a restitution fine above the statutory minimum for failing to consider his or her ability to pay if the defendant did not object in the trial court.  (*People v. Nelson* (2011) 51 Cal.4th 198, 227 [alleged erroneous failure to consider ability to pay a $10,000 restitution fine forfeited by the failure to object]; *People v. Avila* (2009) 46

Cal.4th 680, 729 [forfeiture rule applies to claim that restitution fine amounted to an unauthorized sentence based on inability to pay].)

Here, unlike the defendant in *Dueñas*, *supra*, 30 Cal.App.5th 1157, who created an extensive record showing her inability to pay $220 in assessments and fines, Smith did not object in the trial court on the grounds that he was unable to pay, even though the trial court ordered him to pay the $10,000 statutory maximum restitution fine. (*Id.* at pp. 1161-1163; *People v. Castellano* (2019) 33 Cal.App.5th 485, 490 ["Consistent with *Dueñas*, a defendant must in the first instance contest in the trial court his or her ability to pay . . . ."].) Accordingly, we conclude that Smith forfeited his challenges to the assessment and fines. (*People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1032-1033 [imposition of restitution fine above statutory minimum permitted consideration of ability to pay and defendant's failure to object also forfeited ability-to-pay arguments as to other imposed fines and fees].)

Finally, we reject Smith's contention that an objection would have been futile because the holding in *Dueñas* "represent[ed] a dramatic and unforseen [*sic*] change in the law governing assessments and restitution fines." Even assuming the validity of this argument, trial courts are statutorily authorized to consider a defendant's "inability to pay" any restitution fine above the statutory minimum. (§ 1202.4, subd. (d).) Because the $10,000 restitution fine imposed is greater than the statutory minimum, it would not have been futile for Smith to request an ability to pay determination. Thus, Smith's failure to object to a $10,000 restitution fine is inexcusable, as is his failure to object to the much smaller $300 assessment. (See *People v. Frandsen* (2019) 33 Cal.App.5th

1126, 1154 ["Given his failure to object to a $10,000 restitution fine based on inability to pay, Frandsen has not shown a basis to vacate assessments totaling $120 for inability to pay."].)

V. *SENATE BILL NO. 136*

The first amended information alleged that Smith served two prison terms after suffering convictions for assault likely to cause great bodily injury (§ 245, subd. (a)(1)) and possessing a firearm (§ 12021.1, subd. (a)). The trial court found these two prison priors true. Smith's sentence included consecutive one-year terms for each of the prison priors.

Senate Bill No. 136 amended Penal Code section 667.5, subdivision (b) regarding prior prison term enhancements. Former Penal Code section 667.5, subdivision (b) imposed an additional one-year term for each prior separate prison term or county jail felony term, except under specified circumstances. However, amended Penal Code section 667.5, subdivision (b) imposes that additional one-year term only for each prior separate prison term served for a conviction of a sexually violent offense as defined in Welfare and Institutions Code section 6600, subdivision (b). (Pen. Code, § 667.5, subd. (b).) "By eliminating [Penal Code] section 667.5, subdivision (b) enhancements for all prior prison terms except those for sexually violent offenses, the Legislature clearly expressed its intent in Senate Bill No. 136 . . . to reduce or mitigate the punishment for prior prison terms for offenses other than sexually violent offenses." (*People v. Jennings* (2019) 42 Cal.App.5th 664, 682.)

26

Because Smith served neither of his prior prison terms for a sexually violent offense, his section 667.5, subdivision (b) enhancements are now unauthorized under the amended statute.  The parties agree that Senate Bill No. 136 applies to Smith because the statute is retroactive and applies to all cases not yet final as of its effective date.  (*In re Estrada* (1965) 63 Cal.2d 740, 742; *People v. Keene* (2019) 43 Cal.App.5th 861, 865.)  Accordingly, the now-inapplicable enhancements under section 667.5, subdivision (b) currently attached to Smith's sentence are stricken.  (§ 1260 [granting appellate court power to reduce punishment imposed].)

## DISPOSITION

Smith's convictions on counts 1 through 5 are reversed.  The matter is remanded with directions that the trial court (1) strike the enhancements under section 667.5, subdivision (b), and (2) resentence Smith.  Following resentencing, the trial court is directed to prepare an amended abstract of judgment and forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.  In all other respects the judgment is affirmed.


BENKE, Acting P. J.

WE CONCUR:


HALLER, J.


DATO, J.